In the Matter of the Estate of MILTON CARROLL, Deceased.

Surrogate's Court, Oneida County, March 26, 1930.

*William M. Arthur*, for the administratrix.

*Michael J. Larkin*, for the claimants.

*Searle & Searle* [*D. Francis Searle* of counsel], for the contestants.

EVANS, S.    Milton Carroll died intestate in the town of Western, Oneida county, N. Y., on October 11, 1927.    He was seventy-six years of age.    He was a farmer and left him surviving a widow, Anna Carroll, then sixty-seven years of age, and the following named children, aged as indicated: Alice, forty-three; Lyman, thirty-eight; Christopher, thirty-seven; Ruth, thirty-four, and Cynthia, twenty-seven.    His widow was appointed administratrix of his estate on November 4, 1927, and she has filed her account for a judicial settlement.

Two of the children, Alice and Lyman, filed objections to three items in the account as follows: For the payment of $150 for groceries and supplies used by the family and hired help during about seven weeks following the death of the decedent.    Ruth Carroll, one of the daughters, filed a claim for services alleged to have been rendered by her for the decedent from January 1, 1922, until October 11, 1927, a period of 300 4/7 weeks at $10 per week, amounting to $3,005.70.    Christopher Carroll, one of the sons, filed a claim

for services alleged to have been rendered by him for the decedent from January 1, 1922, to October 11, 1927, a period of 300 4/7 weeks at $12 per week, amounting to $3,606.85. Both of these claims were allowed but not paid by the administratrix. The validity of these items in the account is the subject now presented for determination.

Section 210 of the Surrogate's Court Act provides that the allowance of a claim by the representative of an estate establishes its validity. Any person adversely affected by the allowance of a claim or debt may object to the allowance or payment on the ground of fraud, negligence or collusion on the part of the representative of the estate.

The effect of this provision may be to shift the burden of proof to the contestant and give to an admitted claim some added dignity over a rejected claim, yet I think that it must meet the test and prove its merit the same as a rejected claim, in order to satisfy the conscience of the court in allowing it.

The decedent was a man of energy, force and great industry. He was frugal in his habits. Waste and idleness were foreign to his nature. He taught and exacted from his children thrift, industry and efficiency. The Carroll home was no place for the indolent. The decedent was the head of his family in theory and in fact. He maintained this status after his children became mature men and women. Reference to these personal traits seems necessary in order to comprehend the environment in which the claimants lived.

Alice and Lyman, the contestants, are both married and live on farms of their own. They were frequent callers at their father's home and family relations appear to have been normal and friendly.

The decedent owned a farm consisting of about one hundred and ninety acres. Much of this acreage is woodland or at least uncultivated. About forty-five acres are flat and productive. The decedent leased other land in the immediate vicinity and farmed it with his own. He usually kept a dairy of about fourteen cows and young stock. There were also five or six horses on the farm. The activities of the decedent extended out and beyond the usual work connected with a farm supporting a dairy of the size mentioned. He raised the customary crops of corn, oats and potatoes. Sweet corn and peas were also raised and sold to a nearby canning factory. There was a milk route among village customers and the balance of the milk was sold to a factory or milk station. Excepting in the winter and bad weather his teams and men were employed on highway construction by the State, county or town. He cut, sold and delivered wood to customers in the village of Westernville and the city of Rome. He cut ice and filled icehouses in the village and

drew coal for people from the city of Rome. These side lines, as they may be termed, were carried on in conjunction with the ordinary farm work. It is in connection with this sketch that Christopher and Ruth claim compensation for services. They are unmarried and lived with their parents.

The law is too well settled to require citations that claims against estates must bear careful scrutiny by courts and be allowed only when they measure up and satisfy a rigid rule of caution. The requirements mentioned are further emphasized when claims are presented by persons of close blood ties to a decedent. The case at bar is a common illustration.

There are instances where adult children live with and are supported by parents. It is such a situation that nurtures unjust claims for alleged service. There is a groping or searching for trivial acts that are magnified and stressed to form a foundation for a legal claim. It is this practice that renders it legally necessary for a claimant to prove an implied or express contract in order to recover.

In the matter under consideration our first concern is whether these claimants performed service for the decedent.

The record shows that no subterfuge is needed as to either. The fact of their labor was well known in the community where they lived. It was as obvious as a calliope in a circus parade. The health of Mrs. Carroll was poor. She also suffered from defective vision that required an operation on her eyes. She washed and dried the dishes. That practically comprised the work that she was able to perform. There were five persons in the family and with hired help the number at times was as high as ten. Cynthia worked for one or two families in the village and spent the nights at home. She boarded where she was employed and helped some with the housework at home night and morning. Ruth cooked and prepared the meals, baked, washed and ironed clothes, swept and cleaned the house, cooled the milk, delivered it to customers, packed dinner pails for men working on the highway and did general housework.

There was no specific sum stipulated as her wages but the prices at the time and in that locality for service of the kind rendered was at least ten dollars per week. Mrs. Anna Carroll and her daughter Cynthia, testifying against interest, related conversations that they heard between Ruth and her father. One talk was in the fall prior to 1922 and another in the early part of the winter following. Ruth was employed by a neighbor named Floyd. Decedent declared to her that she was needed at home and that they could not get along without her; that if she would come home to work he would pay her as much as she might receive elsewhere.

Ruth thereupon worked at home until her father's death nearly six years later. There is evidence that she asked decedent for money and he declared that she was extravagant and that he would save her money in the bank and that some day she would have something. Her sister Cynthia testified to buying clothes for Ruth and also giving her money. Decedent at different times mentioned to members of his own family and to others that he must settle with Ruth and Chris.

There is no evidence in the case that contradicts or challenges the justice of this claim and I find and decide that its allowance by the administrator was justified and proper.

The work performed by Christopher was general farm labor and included milking, caring for stock, plowing, planting, hoeing, haying, cutting corn, digging potatoes, cutting and drawing wood, cutting ice, filling icehouses and driving team. He worked on the State highway and on the town roads. He also worked in laying sidewalks in the village of Westernville.

In the year 1921 Christopher left home and went to the city of Rome where he obtained employment. There is some evidence to support the inference that he was not satisfied to longer work at home. After he had been away about three weeks the decedent sent Ruth to induce Christopher to return to his home. Christopher accompanied his sister back home and according to the evidence the decedent and Christopher came to an agreement about future compensation.

It appears that the decedent owed Christopher $200, which he agreed to pay and also to pay him $500 on January 1, 1922, and thereafter at the rate of $2 per day. The sum of $200 was paid by the decedent to Christopher on January 1, 1922, according to a receipt introduced in evidence which also recites that there is a balance due him of $500. There was later a payment of $300 to apply on the $500 debt. There is evidence that the decedent also handed $5 at infrequent intervals to Christopher and sometimes these doles did not exceed $1 in amount. It is not clear whether these small amounts did or did not apply on the $200 balance due to Christopher on the $500 transaction.

During several seasons of the period covered by this claim Christopher worked on the highways for the State and the town. He also worked in the village of Westernville laying sidewalks. This work was done in the vicinity of home and at no time to exceed three miles away. In the year 1922 he worked for the State as a patrol helper from April twenty-fourth to November sixteenth, at the rate of thirty-five cents per hour and was paid $488.75. The records of the superintendent of highways of the town of Western show

employment and payments to Christopher as follows: 1924, $117.80; 1925, $247.60; 1926, $105.20. For sidewalk construction in 1924, $114.30. It is conceded that checks for this labor were made payable to Christopher.

The contestants assert that he retained the money so earned and that it should be applied in reduction or satisfaction of his claim. The mother and two sisters, Ruth and Cynthia, gave testimony to the effect that Christopher delivered to his father all of the checks and was told by him to indorse and cash the checks and bring back the money to decedent, which was done in every instance. The truth of this testimony must be weighed and gauged according to how well it harmonizes with surrounding circumstances.

It is conceivable that an adult son might work and retain his earnings while his father furnished him with free board and lodging. Applying this theory to the decedent and his affairs, the idea seems to me a misfit and fantastic. There is evidence that the decedent directed Christopher to work on the highway and mentioned that he was a taxpayer and needed the money that Christopher might earn to pay taxes. The decedent also at times computed his profits on road work from the men and teams and the difference each day that Christopher was receiving and the amount that decedent agreed to pay him. The decedent in conversations with members of his own family mentioned his debt to Ruth and Christopher. At least two witnesses outside the Carroll family talked with decedent on the same subject.

On the evidence before me I think that the allowance by the administratrix of the claim of Christopher Carroll was proper and that the objections to it should be dismissed.

In connection with the remaining objection of $150 paid by the administratrix for groceries and food, the evidence is that this expenditure was made between October 11, 1927, and December 1, 1927. Between these dates the farm was operated and receipts for milk and any other revenue are accounted for. When the decedent died there remained some of the fall work to be done; some of the corn needed to be cut and husked and the potatoes were not yet dug. Cattle soon needed to be kept in the barn nights and fed. There was milking to be done and the usual work on a farm at that season. It was the duty of the administratrix to preserve the personal property. The farm was sold and also the personal property on or by December 1, 1927. This was not much over seven weeks from the date of death of decedent.

The results obtained in that short period showed promptness and good business management. Since ancient times a widow is permitted to remain in the last residence of a deceased husband

for a period without being liable to payment of rent. "A widow may remain in the chief house of her husband forty days after his death, whether her dower is sooner assigned to her or not, without being liable to any rent for the same; and in the meantime she may have her reasonable sustenance out of the estate of her husband." (Real Prop. Law, § 204.)

The milking of cows and the care of farm animals could not cease even for a day. Corn and potatoes in the field could not be left there to freeze. Christopher and the hired help did the necessary work. They had to eat and Ruth prepared the meals.

This objection appears to me to be without merit and is dismissed. Decreed accordingly.